**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

MICHAEL JONES,                              :

               Plaintiff          :          CIVIL ACTION NO. 3:17-0046

      v.                          :              (JUDGE MANNION)

DR. JOHN LISIAK, *et al.*,               :

          Defendants          :

## MEMORANDUM

### I. BACKGROUND

On May 23, 2016, Plaintiff, Michael Jones, an inmate formerly confined at the Mahanoy State Correctional Institution, Frackville ("SCI-Mahanoy"), Pennsylvania, originally filed the above captioned civil rights action pursuant to 42 U.S.C. §1983 in the Court of Common Pleas of Schuylkill County. (Doc. 1-2 at 2).

On December 18, 2016 Plaintiff filed an amended complaint. (Doc. 1-2 at 16). The named Defendants are Dr. John Lisiak, RNS Karen Holly, Correct Care Solutions, and the Pennsylvania Department of Corrections ("DOC"). Id.

Plaintiff alleges that on or about November 15, 2014, Dr. Lisiak prescribed him Levaquin and Cipro, two antibiotics that Plaintiff believes resulted in the rare side effect of peripheral neuropathy. (Doc. 1-2 at 16-24).

Specifically, Plaintiff raises medical malpractice and Eighth Amendment deliberate indifference claims against Defendant Lisiak for "failing to obtain a proper history or for improperly prescribing the drug", claiming that Defendant Lisiak "knew and/or reasonably should have known that Plaintiff was at risk of side effect of the prescribed drugs but was deliberately indifferent to this risk, failing to warn Plaintiff." Id. at 19-20. Plaintiff brings a negligence claim against Defendant Holly, stating that "the negligence and carelessness of Defendant Holly consisted of the failure to obtain proper history and/or improperly dispensing Levaquin and Cipro to Plaintiff." Id. at 20. Finally, Plaintiff raises an Eight Amendment deliberate indifference claim against Defendants Correct Care Solutions and the Pennsylvania Department of Corrections, claiming that "it was policy, practice and/or custom of Correct Care Solutions to maintain control over the actions of Defendant, physicians, including through medical treatment budgetary constraints and approval" and that "it was policy, practice and/or customs of Pennsylvania Department of Corrections to maintain control over the actions of the Defendant, Correct Care Solutions by contract medical

services as well as Defendant Holly, as employee." Id. 22-23. Plaintiff believes that "the above-described policies, practices and customs demonstrated a deliberate indifference" by Defendants Correct Care Solutions and the DOC, and "were the cause of the violations of Plaintiff's rights alleged herein." Id.

Along with the filing of his amended complaint, Plaintiff filed certificate of merits as to Defendants Lisiak, Holly and Correct Care Solutions, stating that "expert testimony of an appropriate licensed professional is unnecessary to prosecution of the claim against this defendant." Id. at 27-29.

On January 6, 2017, Defendants removed the above captioned action to this Court pursuant to 28 U.S.C. §1441(a). (Doc. 1-4, Notice of Removal).

On June 28, 2017, counsel entered an appearance on behalf of Plaintiff, (Doc. 15), and on August 9, 2017, counsel filed Certificates of Merit as to Defendants Dr. Lisiak and Correct Care Solutions. (Docs. 16, 17).

On February 5, 2018, this Court issued a Case Management Order, requiring Plaintiff to produce any expert reports in support of his claims on or before September 30, 2018, with Defendants' reports being due on or before October 30, 2018. (Doc. 26). Discovery deadline was set for August 30, 2018 and dispositive deadline was set at November 30, 2018. Id.

On October 15, 2018, Defendants Correct Care Solutions and Dr. John Lisiak filed a motion for summary judgment, along with a statement of facts and supporting brief. (Docs. 30-32).

On October 22, 2018, Plaintiff's counsel filed a motion for leave to serve, *nunc pro tunc*, an expert report and place the case on "inactive status" pending a presently unscheduled future neurological examination. (Doc. 33). Counsel noted that he "...either directly or indirectly contacted/spoke to 15 neurologists in the Philadelphia area, all of whom declined to examine plaintiff…" Id. Thus, he sought permission to submit, *nunc pro tunc*, an expert report of Gerald A. Miller, M.D., allegedly created on June 29, 2017, over a year and three months before the deadline for expert discovery in this case had expired. Id. The expert report allegedly concerned the issues of liability and causation, but not the issue of damages. Id. Plaintiff also sought to place the above captioned action "on the inactive list until Plaintiff is able to be examined by a neurologist and determine whether his case should move forward or be withdrawn. Id. Finding that Plaintiff's motion sought to submit his expert report more than fifteen (15) months after its creation, after the close of discovery and after the time set by the court to disclose expert reports, as well as after the filing of Defendants' dispositive motion, the Court denied Plaintiff's motion to submit his expert report and to place the action

on inactive status. (Doc. 42). Plaintiffs' counsel thereafter sought to place the above captioned action on "inactive list for 90 days pending his neurological examination now that he is out of prison and living with his wife in Wilkes-Barre, Pa." (Doc. 44). Plaintiff's motion was subsequently dismissed as moot, as the ninety days had elapsed and Plaintiff never submitted a neurological report of examination. (Doc. 45).

Defendants' motion for summary judgment has been fully briefed and is ripe for disposition. For the reasons that follow, the Court will grant Defendants' motion for summary judgment.

## II.  Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the

motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. White, 826 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. Id. (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."

L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. See Sanders v. Beard, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

### III. STATEMENT OF FACTS[1]

On January 31, 2014, Plaintiff presented to sick call with respiratory complaints. (Doc. 1 at 3, Doc. 30-1 at 75). He was examined by Christopher Collins, CRNP, who noted rhonchi and wheezing, along with very shallow

---

[1] Middle District of Pennsylvania Local Rules of Court provide that in addition to filing a brief in response to the moving party's brief in support, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] ..., as to which it is contended that there exists a genuine issue to be tried." See M.D. Pa. LR 56. 1. The rule further states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. See id. Because Plaintiff has failed to file a separate statement of material facts controverting the statement filed by Defendants, all material facts set forth in Defendants' statement (Doc. 31) will be deemed admitted.

breaths. Id. Mr. Collins diagnosed Jones with bronchitis, and prescribed a chest X-ray, Ventolin (an inhaler), and a seven-day prescription of Levofloxacin (Levaquin) 750mg. Id. Plaintiff's Medication Administration Record reflects that Plaintiff received his first dose of Levaquin on January 31, 2014 and his last dose on February 6, 2014. (Doc. 30-2 at 2, Order History Report).

On February 25, 2014, Plaintiff was assessed in Chronic Care Clinic. (Doc. 30-1). He made no complaints. Id.

On May 1, 2014, Jones was a no show for sick call. (Doc. 30-1 at 73).

On August 25, 2014, Jones was again seen at Chronic Care Clinic. (Doc. 30-1 at 70). He reported that he stopped taking his statins for hyperlipidemia because he felt it was causing him joint pain. Id. Dr. Khanum noted that Plaintiff would not agree to diet compliance. Id. The plan was to recheck CPK levels. (Id.).

On September 15, 2014, Plaintiff reported to sick call, complaining of neuropathy-like symptoms. (Doc. 30-1 at 71). Plaintiff reported to Dr. Rashida Laurence that he took Levaquin in February, and thereafter experienced intermittent left lower leg numbness and tingling. Id. As a result of these symptoms, he reported falling the previous day, which resulted in a loss of consciousness. Id. On examination, Dr. Laurence noted that Plaintiff's

cranial nerves were intact, he exhibited no bruising, and he was able to ambulate without assistance. Id. In her assessment, Dr. Laurence noted: "neuropathy 2° [secondary] to Levaquin per patient." Id.

On October 27, 2014, Plaintiff reported to sick call complained of tingling and numbness (but not weakness) to his bilateral upper extremities with pain to his back that radiated down his leg. (Doc. 30-1 at 66). Plaintiff stated that the onset of these symptoms was February of 2014. Id. During his examination of Plaintiff, Scott Saxon, PA-C noted that Plaintiff's cranial nerves were intact, with the exception of eye movement, which could not be assessed due to Plaintiff refusing to move his eyes; normal upper extremity strength, with minimal effort by Plaintiff in raising his elbows; normal lower extremity strength, with minimal effort by Plaintiff to extend and flex his knees; normal toe and heel standing strength; no midline spinal tenderness, but there was mild posterior lumbar muscle tenderness; 30° extension without pain; and 90°+ flexion without pain. Id. Although noting "normal exam," Mr. Saxon diagnosed Plaintiff with myalgia and paresthesias. Id. The plan was noted as to refer Plaintiff to the Doctor's Line to further assess his chronic muscle pain. (Doc. 30-1 at 37, Physician's Order Form and 66, Progress notes).

On November 7, 2014, Plaintiff was seen by Defendant, Dr. John Lisiak. (Doc. 30-1 at 67, Progress Notes). At this first encounter with Dr. Lisiak, Plaintiff's complaints were reported as follows:

> To MD line to discuss numbness of hands. Also seen for sick call. Says he is a barber student. Another student this past week was sent to the hospital. He is concerned about getting sick after being around him. Inmate says he has had shakiness of both hands for than a year. Denies recent fall or injury, but he says he was a competitive boxer during his late teen years. Denies HA. Denies vision (problems). He says his handwriting has "gone from beautiful to terrible."

(Doc. 30-1 at 67). After an examination in which "no resting tremor…no slurred speech…mild difficulty making a full fist" and "gait unremarkable" was noted, Dr. Lisiak ordered labs to check Plaintiff's electrolytes, thyroid function and glucose and added a multivitamin, with a recommendation to follow-up in several weeks. Id. As prophylaxis, Dr. Lisiak noted that he would "give one dose of Cipro 500" as "general prophylaxis for bacterial meningitis" because Plaintiff "had casual contact with inmate who was hospitalized for MS." Id.

Although Dr. Lisiak indicated in his note that he would prescribe one dose of Cipro, he only recorded the blood panel in his Physician's Order Form (Doc. 30-1 at 37) and Plaintiff's Medical Order History Report for November 7, 2014, contains only an order for Lubriderm, and a multivitamin from Dr. Lisiak. (Doc. 30-2 at 77, 30-3 at 197 30-5 at 322).

With the exception of being prescribed Levaquin for one week, between January 31, 2014 and February 6, 2014, Plaintiff's medical records reveal no other prescription for either Cipro or Levaquin by any medical provider within the Department of Corrections. (See Docs. 30-1, 30-2).

On November 19, 2015, Plaintiff filed Grievance No. 599521, claiming a denial of adequate medical treatment, which was denied by Defendant Karen Holly, Registered Nurse Supervisor, on December 4, 2015 as follows:

> I reviewed your grievance and your medical record. You wrote this grievance because you claim you are being denied adequate medical treatment and access to outside care. The following will prove your grievance is deniable.
>
> You state you were on two different antibiotics in 2014. Documentation in your medical record and your medication administration record show this to be false. On 1/31/14, you requested sick call services for respiratory complaints and you were prescribed Levaquin only. Cipro was never prescribed, nor were you ever prescribed Cipro while incarcerated in the PA DOC. Nerve damage is not a side effect of Levaquin, nor can nerve damage elevate a CPK enzyme.
>
> Also, you state in your grievance that 8/27/13, the FDA issues a Drug Safety Communication alerting the public of what? You do not state what the public should be alerted to. I will provide this information for you. The alert was to prescribing providers to monitor possible tendon tearing as a side effect. There is not documentation in your medial record of you experiencing this side effect.
>
> Since your very first incarceration into the PA DOC under your inmate number FJ-3586 on 5/16/2003, your laboratory studies have shown you to have high cholesterol. You were referred to chronic clinic. During these visits, education, teaching, and

- 12 -

monitoring of laboratory studies was provided to you. You were encouraged to alter your diet and exercise to control your cholesterol. Much documentation supports your resistance to the lifestyle changes and refusing the initiation of medication.

After complying, cholesterol medication was prescribed three different medication at different times since 8/20/13. The reasoning is due to your complaints of muscle tenderness and joint pain. In the middle of this, the practitioners noted an elevated CPK. This is an enzyme that is released into your blood stream when your muscles are extremely fatigued, stressed, or strained. Hence restrictions were applied after mixed admissions by you admitted to extreme workouts, bargaining to be allowed to do certain work outs and denying working out.

The practitioners need to start at a medical baseline work-up to define the origin of your elevated CPK's. Many laboratory studies were ordered, such as Aldolase level, which is an enzyme that detects muscle disease. In addition, CBC's, ANA screen, Lyme antibodies, RA level, Vitamin B12 level, and Folate level all have been ordered and completed with no significant findings. Therefore, the next step is a Rheumatology referral, which approval is pending.

This grievance is denied due to the above factual information. You are not being denied adequate medical treatment and access to outside care. Please be aware that all medical work up starts at a baseline and progress to more specific diagnostics to obtain a diagnosis. At this time, a diagnosis is not confirmed. Keep in mind this process is slowed due to non-compliance and dishonesty from you as the patient. Monetary gains are not awarded via the grievance system.

(Doc. 30-14, Initial Review Response).

Plaintiff's 364 pages of medical records reveal that between February 6, 2016 through February 14, 2018, Plaintiff was seen, treated, and referred to outside specialists for bloodwork, diagnostic testing and, or, physical

therapy, a total of forty-eight (48) times. (<u>See</u> Docs. 30-1 through 30-10). At no time during these forty-eight medical encounters was Plaintiff diagnosed with neuropathy. <u>See Id</u>. In fact, Plaintiff's most recent referral for a Neuromuscular/Neurology Consultation with Dr. Neil R. Holland at Geisinger Wyoming Valley Medical Center, summarized the history of his treatment and determined there was no evidence of polyneuropathy, based on the following:

> **<u>History of Present Illness</u>**
> This is a bit of a convoluted story. He was seen in rheumatology here in 2016 because of numbness and a C[P]K in the 2000s. They recommended an EMG. He had the EMG (by Dr. Macguire) in 2016. I am a little confused by what has happened since. The EMG report might have said, or at least have been interpreted as saying, "evidence of neuropathy and myopathy" demonstrated.[2]

---

[2] On August 3, 2016, Plaintiff underwent an (Electromyography) EMG at Geisinger Medical Center Neurophysiology Department. (Doc. 30-2 at 93-94, Doc. 30-7 at 14-17). In his report, which analyzed the results of the EMG, Dr. Macguire stated: "There is [no] electrodiagnostic evidence for a generalized neuropathy or myopathy on this study." (Doc. 30-9 at 23). Notwithstanding the fact that Plaintiff self-reported no sensation to temperature in the face, arms, or legs, Dr. Macguire noted that "Sensory and motor responses in the right arm and leg are normal" on the Nerve Conduction Studies on the EMG. (Doc. 30-7 at 4-5). Moreover, he documented the following with regard to the EMG examination findings: "concentric needle electromyographic examination of selected right leg muscles demonstrated no acute or chronic denervation. Motor units were normal appearing with a normal interference pattern." <u>Id</u>. Due to Plaintiff's subjective complaints, however, Dr. Macguire recommended a neuromuscular consult.

*(footnote continued on next page)*

There is a (presumably am[]ended) report of this study from 2017 which says, "no evidence of neuropathy or myopathy." Before that occurred, Cindy Campbell saw the patient, and based on the CPK and (perceived abnormal) EMG report suggested muscle biopsy and/or neuromuscular consult. He had more C[P]Ks in March 2017 which were much lower, in the 200-300s. He has had more recent blood work, but we do not have those results today. He was scheduled f[]or an appointment with me here today for a neuromuscular consult. He tells me his history consists of pain, tremor, headache, and numbness. He believes all of these symptoms started after he[] was given ciprofloxacin and/or another quinolone for a chest infection in 2014. He was also on Lipitor in the past, perhaps until 2014 or 2015. I do not have any of those (outside) records. The pain is in his back (he says spinal cord) and thighs, worse when he is like writing or typing. The headaches occur 4 out of 5 days and are bilateral and indescribably (in terms of type of pain). He says the shower feels like "needles" on his skin – he cannot describe if that is a burning or if the water is too hot. He also has "numbness" in his arms and legs. He says that he tried Prednisone (presumably for the high C[P]K) in the past, which only made him gain weight, and Neurontin (which made him lose hair). He says that outside neurologists (he says his aunt is a neurologist at Penn) have reviewed his case, and suggested PT and "light" therapy, which he has not received.

---

The Court notes that the original August 3, 2016 EMG Report by Dr. Macguire was later amended to correct a typographical error within the report. (Doc. 30-7 at 14-17). As is reflected in the record, the only change to the amended report was to correct the original from "There is electrodiagnostic evidence for a generalized neuropathy or myopathy on this study" to "There is no electrodiagnostic evidence for a generalized neuropathy or myopathy on this study." The omission of the word "no" in the original report was quite obviously a typographical error, as the entirety of the more specific findings detailed within the body of the report were grossly normal. Id.

- 15 -

**Investigations Reviewed at Today's Visit**

I personally reviewed his EMG, which was indeed normal based on the data provided – certainly no large fiber neuropathy or muscle abnormality in need of EMG exam of muscles tested.

**Impression**

He has had high C[P]K's – 2000 in 2016 and 2-3000 last year. Based on the lack of objective findings on exam and normal EMG, muscle biopsy would be low yield. The pain in his back and legs occurs at rest and is relieved by movement. This could conceivable be some manifestation of "restless limb" phenomenon. There was no EMG evidence of large-fiber polyneuropathy. While it is conceivable that he could still have some small-fiber neuropathy, his findings on exam of numbness, weakness and tremor all appear to be non-organic, and incipient small-fiber neuropathy could not account for all of this anyway.

**Recommendations**

I would not suggest a muscle biopsy at this time, for the reasons discussed above. We talked about trying a medication for RLS, but he seemed unwilling to consider this diagnosis. Otherwise, physical therapy and reassurance might be helpful. He mentioned that he was not satisfied with what I had to say and would want to seek other opinions neurologic opinions elsewhere.

(Doc. 30-8, Consultation Record at 3-16.

On February 20, 2018, Plaintiff was seen in Chronic Care Clinic for his hyperlipidemia by Dr. Khanum. (Doc. 30-2 at 133- 139). Dr. Khanum's report contains the following comments:

Last neurology consult from Dr. Holland, GMC reviewed and discuss with inmate.

Nonspecific findings, refer to PT and return to neuro as needed. No indication for muscle biopsy at this time per Dr. Holland.

- 16 -

Refer to Saphire for detail report.

When consult discuss with inmate, he became very upset and say, "That doctor was bullshit, he was unprofessional, he didn't know what he is doing, my aunt is a doctor, and she said these doctors are idiots."

Inmate goes on to saying, "You treat us like pigs, I will not take any pills you give me, I want those injections for my high cholesterol level which I saw on TV." Despite education and counseling inmate continue to refuse the aspirin and Tricor and only agrees to physical therapy referral on site. During conversation inmate multiple times declares that "You are not giving me what I want, I will not take any pills, I am not signing any paper for refusal now."

RN Kim Murray present during entire visit and witnessed the conversation, see DC 462 in Saphire for today's OV.

Will order Aspirin 81 Mg QD and Tricor as before, if inmate changes his mind he can start the medication. Check Labs in 3 months from past lab, that is 03-2018, then in 05-2018 before next CC F/U in 06-2018.

(Doc. 30-2 at 138).

## IV. DISCUSSION

### A. Medical Negligence Claim

In Pennsylvania, medical negligence, or medical malpractice, is defined as "the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services."

- 17 -

Toogood v. Owen J. Rogal, D.D.S., P.C., 824 A.2d 1140, 1145 (Pa. 2003) (citing Hodgson v. Bigelow, 7 A.2d 338 (Pa. 1939)). The existence of an injury, by itself, does not prove a doctor's negligence. Mitchell v. Shikora, 209 A.3d 307, 315 (Pa. 2019) (citations omitted). Rather, under Pennsylvania law, to establish a cause of action for negligence, the plaintiff must prove the following elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages. See Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 139 (3d Cir. 2005) (citing In re TMI, 67 F.3d 1103, 1117 (3d Cir. 1995)).

Under Rule 1042.3 of the Pennsylvania Rules of Civil Procedure, a plaintiff seeking to raise medical malpractice claims must file a valid Certificate of Merit (COM). That rule states in pertinent part:

(a) In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party that either []

(1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards

- 18 -

and that such conduct was a cause in bringing about the harm, or

(2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or

(3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

Pa. R. Civ. P. 1042.3(a). The requirements of Rule 1042.3 are substantive in nature and, therefore, federal courts in Pennsylvania must apply these prerequisites of Pennsylvania law when assessing the merits of a medical malpractice claim. See Liggon-Redding v. Estate of Sugarman, 659 F.3d 258, 262-65 (3d Cir. 2011); Iwanejko v. Cohen & Grigsby, P.C., 249 F. App'x 938, 944 (3d Cir. 2007). This requirement applies with equal force to counseled complaints and to *pro se* medical malpractice actions brought under state law. See Hodge v. Dep't of Justice, 372 F. App'x 264, 267 (3d Cir. 2010) (affirming district court's dismissal of medical negligence claim for failure to file a certificate of merit); Levi v. Lappin, No. 07-1839, 2009 WL 1770146, at *1 (M.D. Pa. June 22, 2009).

Defendants seek judgment as a matter of law on Jones' medical malpractice claims based on his failure to comply with Pennsylvania's "COM" requirements.

On December 18, 2016, concurrent with the filing of his amended complaint, Plaintiff filed three certificates of merit, with regard to Defendants Dr. Lisiak, Nurse Holly and Correct Care Solutions, (Doc. 1-3 at 62-64), certifying that expert testimony of an appropriate licensed professional was unnecessary for prosecution of Plaintiff's claims against these Defendants. Id.

Over one year later, on August 9, 2017, Plaintiff's counsel submitted another Certificate of Merit, which stated:

> an appropriate licensed professional has supplied a written statement to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by this defendant in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm.

(Docs 16, 17). By Order dated February 8, 2018, Plaintiff was required to submit his expert report on, or before, September 30, 2018. (Doc. 26). By motion dated October 22, 2018, Plaintiff's counsel requested leave to serve, *nunc pro tunc*, a June 29, 2017 expert report, which spoke only to the issues of liability and causation, but not to the issue of damages. (Doc. 33). He further sought to have the case put on an inactive list while he further investigated "whether the case should move forward or be withdrawn." Id. The Court denied Plaintiff's motion, finding that the motion sought to submit an expert report some fifteen months after its creation, after the close of

- 20 -

discovery and time set for disclosure of expert reports, as well as after the filing of Defendants' motion for summary judgment. (Doc. 42). The Court further denied Plaintiff's motion to place the above captioned action on inactive status. Id. Consequently, Plaintiff is bound by his December 18, 2016 Certificates of Merit submitted with his amended complaint.

In order to satisfy the burden of his medical malpractice claim, Jones must establish to a reasonable degree of medical certainty (1) the standard of care required from the physicians, in this case the Medical Defendants; (2) deviation from the standard of care by the Medical Defendants; and (3) that such deviation constituted the proximate cause of the harm suffered by Jones. Mitzelfelt v. Kamrin, 526 Pa. 54, 62, 584 A.2d 888, 892 (1999); Toogood v. Owen J. Rogal, DDS, PC, 573 Pa. 245, 255, 824 A.2d 1140, 1145 (Pa. 2003).

In a medical liability action, expert testimony on the standard of care and on causation constitutes indispensable requirements of establishing a right to recovery. Hoffman v. Mogil, 665 A.2d 478, 481 (Pa. Super. 1995). The jury may not presume or infer negligence because the medical care resulted in an unfortunate result which might have occurred even though proper skill and care had been provided by the physician. In order to determine whether a physician has violated the required standard of care the

jury must hear testimony from a competent expert identifying that standard. Toogood, supra, 824 A.2d at 1145. If a plaintiff fails to produce an expert medical opinion addressing the elements of his cause of action with a reasonable degree of medical certainty, he has failed to establish a prima facie case of medical malpractice and may not proceed to trial. See Miller v. Sacred Heart Hosp., 753 A.2d 829, 833 (2000); Eaddy v. Hamathy, 694 A.2d 639, 643 (Pa. Super. 1997). See also Liggon-Redding, 659 F.3d at 265; Robles v. Casey, 2012 WL 382986, at *3 n.1 (M.D. Pa. Feb. 6, 2012). Additionally, the Pennsylvania legislature prohibits anyone not a physician from testifying against a physician on the issue of the standard of care and on causation. 40 P.S. §1303.512.

To meet the first and second elements of a medical negligence claim, Jones must establish by expert testimony "the recognized standard of care and that the care or treatment rendered fell below such standard." Titchnell v. United States, 681 F.2d 165, 169 (3d Cir. 1982); Maresca v. Mancall, 135 Fed. Appx. 529, 531 (3d Cir. 2005); Welsh v. Bulger, 698 A.2d 581, 585 (Pa. 1997) ("[A] plaintiff must present expert testimony to establish to a reasonable degree of medical certainty that the defendant's acts deviated from an accepted medical standard, and that such deviation was the proximate cause of the harm suffered."). "Should a plaintiff certify that expert

testimony is unnecessary, 'in the absence of exceptional circumstances the attorney is bound by the certification and, subsequently, the trial court shall preclude the plaintiff from presenting testimony by an expert on the questions of standard of care and causation.'" See Rodriguez v. United States, No. 3:14-cv-1149, 2016 WL 4480761, at *4 (M.D. Pa. Aug. 23, 2016) (quoting Pa. R. Civ. P. 1042.3(a)(3), aff'd, 695 F. App'x 669 (3d Cir. 2017). See also, Pa. R. Civ. P. 1042.3(a)(3). In short, "the consequence of such a filing is a prohibition against offering expert testimony later in the litigation, absent 'exceptional circumstances.'" See Liggon-Redding, 659 F.3d at 265.

This exception is narrow. "The only instance in which expert testimony is not required is when the matter is so simple or the lack of care so obvious as to be within the range of experience and comprehension of non-professional persons." Hakeem v. Salaam, 260 F. App'x. 432, 435 (3d Cir. 2008) (citing Hightower–Warren v. Silk, 548 Pa. 459, 698 A.2d 52, 54 n. 1 (1997)).  Significantly, "[i]t is well-settled that reliance on the doctrine of *res ipsa loquitur* in medical negligence cases 'must be carefully limited.' "[3] Njos

---

[3] *Res ipsa loquitur* is a rule of evidence permitting an inference of negligence from the circumstances surrounding the injury. Quinby v. Plumsteadville Family Practice, Inc., 589 Pa. 183, 907 A.2d 1061, 1071 (Pa.2006). The Pennsylvania Supreme Court has adopted *res ipsa loquitur* as articulated in the Restatement (Second) of Torts §328D. Id. (citation omitted). Under §328D, it may be inferred that the harm suffered was caused
*(footnote continued on next page)*

v. United States, 2017 WL 6949812 (M.D. Pa. Oct. 17, 2017). Three conditions must be met before the doctrine may be invoked:  (a) either a lay person is able to determine as a matter of common knowledge, or an expert testifies, that the result which has occurred does not ordinarily occur in the absence of negligence; (b) the agent or instrumentality causing the harm was within the exclusive control of the defendant; and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event. See Toogood, 824 A.2d at 1149-50.

The Court agrees with Defendants. A COM that commits Jones to proceeding without expert testimony is fatal to his medical malpractice claims. See Sutton v. Cerullo, No. 3:10-cv-1899, 2016 WL 1393390, at *6 (M.D. Pa. Apr. 8, 2016) (granting summary judgment because the inmate-plaintiff failed to offer expert testimony regarding his plantar fasciitis, concluding that his "foot pain" and foot condition were "not within the ordinary

---

by the negligence of the defendant when: (a) the event is the kind which does not ordinarily occur in the absence of negligence; (b) the evidence sufficiently eliminates other possible causes, including the conduct of the plaintiff and third parties; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff. If the court determines that these prerequisites are met, it is for the jury to determine whether an inference of negligence should be drawn. See Toogood, 573 Pa. 245, 824 A.2d 1140, 1149–50 (Pa.2003) (plurality) (holding that before *res ipsa loquitur* may be invoked, plaintiffs must meet the three §28D conditions).

knowledge of the jury"); Crum v. United States, No. 06-250 Erie, 2009 WL 693262, at *7-9 (W.D. Pa. Mar. 13, 2009) (concluding that the inmate-plaintiff's failure to provide expert testimony regarding the defendant's failure to prescribe medication was fatal to his medical negligence claim).

Although his filing satisfies the requirements of Rule 1042.3, see Liggon-Redding v. Estate of Sugarman, 659 F.3d 258, 265 (3d Cir. 2011), his claim involves the alleged prescribing of two antibiotics, which Plaintiff believes resulted in neuropathy. His injury concerns complex issues relating to the standard of care and causation, which he cannot establish without expert testimony. Toogood, 573 Pa. at 264, 824 A.2d at 1151.  This is not a case where a licensed medical professional's deviation from the standard of care and that deviation's causation of injury are obvious and within the realm of layperson knowledge, such as, for example, when a surgeon inadvertently leaves a sponge or other medical material/instrument in a patient's abdominal cavity. See Jones v. Harrisburg Polyclinic Hospital, 437 A.2d 1134, 1138 n.11 (Pa. 1981). See also Preacher v. Correct Care Servs., No. 2:19-CV-1207, 2021 WL 862320, at *6 (W.D. Pa. Jan. 29, 2021), *report and recommendation adopted*, No. CV 19-1207, 2021 WL 858501 (W.D. Pa. Mar. 8, 2021), citing Paige v. Holtzapple, 2009 WL 2588849, *4 (M.D. Pa. 2009) ("Where the conduct at issue constituted an integral part of rendering

medical treatment, and involved diagnosis, care, and treatment by a licensed professional, ... the action is one that is characterized as a professional negligence action requiring expert testimony") (collecting cases). Consequently, he "may not rely upon Rule 1042.3(a)(3) or the doctrine of *res ipsa loquit[u]r* to carry his burden of proof on the issues of negligence and causation that are central to this tort claim."  See Njos, 2017 WL 6949812. Accordingly, Defendants are entitled to judgment as a matter of law as to Jones' medical malpractice claims.

### B. Eighth Amendment Claims

The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97 (1976)). In order to establish an Eighth Amendment medical claim, an inmate must allege acts or omissions by prison officials sufficiently harmful to evidence deliberate indifference to a serious medical need. See Spruill v. Gillis, 372 F.3d 218, 235-36 (3d Cir. 2004); Natale v. Camden Ctv. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003). In the context of medical care, the relevant inquiry is whether the defendant was: (1) deliberately indifferent (the subjective component) to (2) the plaintiff's serious medical needs (the

objective component). Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987); West v. Keve, 571 F.2d 158, 161 (3d Cir. 1979).

A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth Cty. Corr. Inst. Inmates, 834 F.2d at 347. "[I]f unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment." Young v. Kazmerski, 266 Fed. Appx. 191, 193 (3d Cir. 2008)(quoting Monmouth Cty. Corr. Inst. Inmates, 834 F.2d at 347). Assuming arguendo that the Complaint did satisfy the serious medical need threshold, the record reveals no facts which could establish a claim of deliberate indifference.

With respect to the subjective deliberate indifference component, the Supreme Court has established that the proper analysis for deliberate indifference is whether a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 841 (1994). A complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment [as]

medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106.

When a prisoner has actually been provided with medical treatment, one cannot always conclude that, if such treatment was inadequate, it was no more than mere negligence. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993). It is true, however, that if inadequate treatment results simply from an error in medical judgment, there is no constitutional violation. See id. However, where a failure or delay in providing prescribed treatment is deliberate and motivated by non-medical factors, a constitutional claim may be presented. See id.; Ordonez v. Yost, 289 Fed. Appx. 553, 555 (3d Cir. 2008)("deliberate indifference is proven if necessary medical treatment is delayed for non-medical reasons.").The Court of Appeals for the Third Circuit in Durmer added that a non-physician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when he is already receiving treatment by the prison's medical staff. However, where a failure or delay in providing prescribed treatment is deliberate and motivated by non-medical factors, a constitutional claim may be presented. See id.

Plaintiff has failed to satisfy the initial burden of an Eighth Amendment medical claim, in that he does not suffer from a serious medical need as

required by Estelle. Plaintiff alleges that on November 15, 2014, Defendant Lisiak prescribed two antibiotics, Levaquin, and Cipro, without revealing a potential serious side effect, namely peripheral neuropathy, which Plaintiff claims to now suffer from. (Doc. 1-3 at 52).

Initially, the Court notes that Plaintiff's medical records reveal that Plaintiff was prescribed Levaquin on one occasion, January 31, 2014, by Christopher Collins, CRNP. (Doc. 1 at 3, Doc. 30-1 at 75). Mr. Collins' Progress Note was not countersigned by Dr. Lisiak, Id., nor was the prescription for Levaquin co-signed by Dr. Lisiak, (Doc. 30-1 at 77). As a Certified Registered Nurse Practitioner, Christopher Collins was able to diagnose and prescribe medications for patients. He did not require the approval of a physician to do so, and in fact, here, the records show that he made an independent decision to prescribe Levaquin to Plaintiff. However, even if Mr. Collins required supervision, as stated in his Affidavit, Dr. Lisiak was not the Site Medical Director of SCI-Mahanoy in January, 2014 (Dr. Khanum was) and, therefore, he did not supervise Mr. Collins' medical care. (Doc. 30-15 at 1). Thus, Plaintiff's own medical records reveal that Dr. Lisiak was not personally involved in dispensing Levaquin to Jones on either January 31, 2014 or November 15, 2014.

To the extent that Plaintiff alleges that on November 15, 2014, Dr. Lisiak prescribed Cipro for him, Plaintiff's medical records reveal that Plaintiff was seen by Dr. Lisiak on November 7, 2014. (Doc. 30-1 at 67, Progress Notes). Plaintiff expressed his concern about getting sick after being around an inmate who had meningitis. Id. Although Dr. Lisiak indicated in his note that as a prophylaxis, he would prescribe one dose of Cipro, he only recorded the blood panel in his Physician's Order Form (Doc. 30-1 at 37) and Plaintiff's Medical Order History Report for November 7, 2014, contains only an order for Lubriderm, and a multivitamin from Dr. Lisiak. (Doc. 30-2 at 77, 30-3 at 197 30-5 at 322).

In an attempt to refute this, Plaintiff submits as an exhibit in opposition to Defendants' motion, a copy of a prescription envelope dated November 15, 2014, administering one dose of Cipro, signed by Dr. Lisiak. (Doc. 35 at 15). The authenticity of this exhibit is questionable because, while the date corresponds to the date alleged in Plaintiff's amended complaint, Plaintiff's actual visit with Dr. Lisiak occurred eight days earlier, on November 7, 2014. Additionally, Plaintiff's Medication Order History Report does not reveal the dispensing of any medications on November 15, 2014. (See Doc. 30-2 at 2). Regardless, while Plaintiff's submission attempts to create a dispute of fact, the Court finds it not to be a material one.

The record before the Court reveals that before Plaintiff was ever seen by Dr. Lisiak, he had already claimed to be suffering from peripheral neuropathy due to the dose of Levaquin he had received eleven months prior, on January 31, 2014. On September 15, 2014, two months before he was seen by Dr. Lisiak, Jones reported to Dr. Rashida Laurence that he had taken Levaquin in February, and thereafter experienced intermittent left lower leg numbness and tingling. On October 27, 2014, Jones complaint of tingling and numbness in both legs to PA Scott Saxon and said it had started in February. Thus, even if the Court were to find that there is a factual dispute over whether Dr. Lisiak prescribed Cipro to Plaintiff, it would not be material to Plaintiff's case without competent evidence to demonstrate some medical causation, given that Plaintiff had already complained of being injured much earlier, from having taken the Levaquin eleven months prior.

However, even if the Court were to take Plaintiff's allegation that he was prescribed one dose of Cipro by Dr. Lisiak on November 15, 2014 as true, there is no evidence of record demonstrating that Plaintiff suffered a serious medical condition, specifically, peripheral neuropathy. In fact, various tests and examinations have ruled neuropathy out of the differential diagnosis. Instead of neuropathy, Plaintiff's specialists have opined that his hand tremors and leg weakness may be related to his long history of boxing,

muscular dystrophy, or restless leg syndrome. Some offsite physicians have even suggested that Plaintiff's symptoms are psychosomatic, or that he is exaggerating or counterfeiting his symptoms. This is certainly supported by the multiple instances of perceived magnification of his injuries that were identified by both the prison doctors and his specialists, as follows:

> • October 27, 2014: Scott Saxon, PA -C noted questionable instances of faking/malingering on examination as follows: Plaintiff refused to move his eyes for cranial nerve examination; minimal effort by Plaintiff in raising his elbows; minimal effort by Plaintiff to extend and flex his knees. (Doc. 30-1 at 37, 66).
> • February 6, 2015: Dr. Khanum questioned whether Plaintiff's inability to make a fist was intentional. (Doc. 30-1 at p. 64).
>
> • March 9, 2016: Dr. Mohammad Aslam at Pottsville Neurology Clinic noted that his findings on exam were inconsistent with Plaintiff's reports. (Doc. 30-2 at 107).
>
> • February 21, 2017: Dr. Khanum noted that it "seems like [patient] drops intentionally despite connection." (Doc. 30-5 at 304).
>
> • February 14, 2018: Dr. Holland noted some inconsistent and/or intentionally magnified movements, as follows:
>
> **Musculoskeletal**
>
> > He barely co-operates for strength testing, **with slow and tremulous movements, involving co-contraction of agonist and antagonist muscles.**
> >
> > He can barely move his legs in the chair, and yet was able to stand up and walk almost normally, **so overt motor inconsistency.**
> >
> > Muscle bulk is normal, so **no atrophy**.

. . .

**Cranial Nerves**

> When testing eye movements, he had deliberately slow eye movements.

. . .

**Sensation**

> Subjective "numbness" to pin in a non- physiologic pattern (arms and legs, stopping at the shoulders and upper thighs).

**Reflexes**

> Normal

**Co-ordination**

> **Deliberately slow** movements when testing for dysmetria.

**Movements**

> Tremor, at rest and posture, worse when being specifically examined, **and improved with distraction**.

(Doc. 30-8 at 8, emphasis in original). Plaintiff does not refute this. Thus, while Plaintiff may believe that he has neuropathy, his medical records do not support this claim at all. Because there is no evidence that Plaintiff suffers from neuropathy, he, therefore cannot demonstrate that he suffered from a serious medical condition for purposes of his Eighth Amendment claim.

- 33 -

Thus, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment medical claim.

Finally, because the Court concludes that the individual Defendants did not violate Jones' constitutional rights under the Eighth Amendment, the Court finds that Defendants Correct Care Solutions and Pennsylvania Department of Corrections cannot be liable based on the theory that they established or maintained an unconstitutional policy or custom responsible for violating Plaintiff's rights. See City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); Goodrich v. Clinton Cnty. Prison, 214 Fed.App'x. 105, 113 (3d Cir. 2007) (unpublished) (policy makers not liable in prison medical staff's alleged deliberate indifference to prisoner's serious medical needs, where, given that there was no underlying violation of prisoner's rights, policy makers did not establish or maintain an unconstitutional policy or custom responsible for violating prisoner's rights).

Accordingly, summary judgment on Plaintiff's unconstitutional protocol claim is appropriate in favor of Defendant Correct Care Solution, as well as dismissal of the claim against Defendant Department of Corrections.[4]

---

[4] Although Defendants Pennsylvania Department of Corrections did not join in Defendants' motion for summary judgment, if a complaint fails to state a claim upon which relief may be granted, the Court must dismiss the complaint. See id. §1915A(b)(1). District courts have a similar screening
*(footnote continued on next page)*

## C. **Defendant Karen Holly, R.N.S.**

Plaintiff alleges that the "injuries [he] suffered was caused by the negligence and carelessness of Defendant Holly and was in no way caused or contributed to by the Plaintiff." (Doc. 1-3 at 55). Specifically, he contends that Defendant Holly's "act of dispensing the aforementioned medications is outrageous conduct displaying a wanton and reckless indifference to the

---

obligation with respect to actions filed by prisoners proceeding in forma pauperis and prisoners challenging prison conditions. See id. §1915(e)(2)(B)(ii) ("[T]he [C]ourt shall dismiss the case at any time if the [C]ourt determines that . . . the action or appeal . . . fails to state a claim on which relief may be granted . . . ."); 42 U.S.C. §1997e(c)(1) ("The [C]ourt shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility if the [C]ourt is satisfied that the action . . . fails to state a claim upon which relief can be granted.").

Additionally, the DOC is entitled to dismissal as the Eleventh Amendment bars suits against a state and its agencies in federal court that seek monetary damages. See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99-100 (1984). "Because the Commonwealth of Pennsylvania's Department of Corrections is part of the executive department of the Commonwealth, ... it shares in the Commonwealth's Eleventh Amendment immunity." Lavia v. Pa. Dep't of Corr., 224 F.3d 190, 195 (3d Cir. 2000). Plaintiff's claims for injunctive relief against the DOC are also barred by the Eleventh Amendment. See Beckett v. Pa. Dep't of Corr., 597 F. App'x 665, 667 (3rd Cir. 2015) (citing Will v. Mich Dep't of State Police, 491 U.S. 58, 71 (1989)). Moreover, the DOC does not qualify as a "person" amenable to suit pursuant to §1983. See Pettaway v. SCI Albion, 487 F. App'x 766, 768 (3d Cir. 2012) (citing Will, 491 U.S. at 71).

health, safety, rights and interests of others subjecting him to punitive damages. Id.

Additionally, Plaintiff alleges that Defendant Holly denied his Grievance No. 599521, stating "documentation show prescribed Levaquin only never Cipro while incarcerated, nerve damage not a side effect of Levaquin, nor can nerve damage elevate CPK enzyme." (Doc. 1-3 at 54).

Although Defendants do not make any arguments for dismissal of Defendant Holly, the court will nonetheless review the claims against her under the screening provision of 28 U.S.C. §1915(e)(2)(B)(ii), which requires federal courts to review complaints brought *in forma pauperis* and dismiss them "at any time" if the court determines that they fail to state a claim upon which relief may be granted.

It is well-settled that a defendant cannot be liable for a violation of a plaintiff's civil rights unless the defendant was personally involved in the violation. Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 289 (3d Cir. 2018). The defendant's personal involvement cannot be based solely on a theory of *respondeat superior*. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, for a supervisor to be liable for the actions of a subordinate, there must be evidence of personal direction or actual knowledge and acquiescence. Id. Moreover, a defendant's review and denial of a prisoner's

grievance is not sufficient to establish the defendant's personal involvement in an underlying violation of the prisoner's constitutional rights. Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020).

By Plaintiff's own allegations, it is clear that Defendant Holly was not involved in the prescribing or dispensing of either Levaquin or Cipro to Plaintiff. Specifically, Plaintiff states that it was only Defendant, Dr. Lisiak who allegedly prescribed Levaquin and Cipro on November 15, 2014. (Doc. 1-3 at 52). As such, there are no allegations of her personal involvement beyond the fact that Defendant Holly reviewed and denied Jones' grievance, which is insufficient to allege personal involvement under §1983. Dooley, 957 F.3d at 374. Accordingly, Defendant Holly will be dismissed for Jones' failure to allege her personal involvement and as a matter of law for her involvement in the denial of Plaintiff's grievance.

## V. LEAVE TO AMEND

The Third Circuit has instructed that if a civil rights complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

Here, it is clear from the facts alleged in Plaintiff's complaint that any attempt to amend the plaintiff's §1983 claims against Defendant DOC and Defendant Holly would be futile. See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004). Thus, the Court will dismiss the Plaintiff's §1983 claims against these Defendants without leave to amend.

## VI. CONCLUSION

For the reasons set forth above, the Court will grant the motion for summary judgment, (Doc. 30) filed on behalf of Defendants Correct Care Solutions and John Lisiak. The Court will dismiss Defendants, Pennsylvania Department of Corrections and RNS Karen Holly pursuant to 28 U.S.C. §1915(e)(2)(B)(ii).

A separate Order shall issue.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: January 25, 2022**
17-0046-01